*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re A. T. S. HARRIS, Minor.

UNPUBLISHED
November 3, 2022

No. 359788
Wayne Circuit Court
Family Division
LC No. 2014-516981-NA

Before: LETICA, P.J., and SERVITTO and HOOD, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her minor child, AH, under MCL 712A.19b(3)(a)(*i*) (child abandoned and parent unidentifiable), (a)(*ii*) (desertion for 91 or more days without seeking custody), (c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide care and custody), (j) (reasonable likelihood of harm if child returned to parent's home), and (k)(*i*) (abuse involving abandonment). We reverse and remand for further proceedings.

## I. BACKGROUND FACTS

Respondent gave birth to AH when she was 15 years old. In June 2014, approximately six months after respondent gave birth to AH, petitioner, the Michigan Department of Health and Human Services (MDHHS), filed a petition seeking to remove AH from respondent's care because, in part, she did not have proper income or housing. When MDHHS filed the petition, respondent was 16½ years old. The trial court developed a case services plan for respondent. The plan required respondent to participate in mental health services, including psychological and psychiatric evaluations and counseling, and attend parenting and employment-development classes. When respondent's mother refused to allow respondent to live with her, and would not sign paperwork to allow respondent to receive services, respondent was made a temporary court ward (in this case) and placed in a residential treatment facility. After completing some services, respondent was transitioned to semi-independent living, and AH was placed with her. In late-September 2016, the trial court terminated its jurisdiction, noting that respondent was a temporary ward herself and would continue to receive services.

In December 2017, respondent, who, at some point, obtained employment, lost her job and did not have stable housing. She called Children's Protective Services (CPS) seeking assistance.

-1-

CPS then placed AH with respondent's maternal great aunt. At a hearing in mid-December 2017, respondent admitted she was unable to care for AH because she did not have stable housing or a legal source of income. She also admitted that she had been diagnosed with schizophrenia, bipolar disorder, and depression. Though she was prescribed medication, she was not taking it and was not attending mental health treatment. She also identified AH's father, but that individual had not established paternity. Based on respondent's admissions, the trial court exercised jurisdiction over AH and ordered AH's father to establish paternity.

At the initial dispositional hearing in late January 2018, Jeremy Davis, the foster-care worker at the time, indicated that an initial service plan was prepared for respondent. Initially, respondent was noncompliant with services. But by the mid-July 2018 review hearing, respondent was progressing toward unsupervised, overnight visits with AH. She had completed parenting classes, as well as psychological and psychiatric evaluations. She was also participating in individual therapy. Although respondent still needed stable housing at this point, she had steady employment.

In October 2018, respondent was compliant with services and the permanency plan was reunification. At a review hearing that month, the trial court anticipated discussing AH's return to respondent's care by the next hearing, and a DNA test confirmed the identity of AH's biological father. The court found that individual to be AH's legal father.

During a February 2019 review hearing, respondent informed the court that she had recently moved and although she lost one job, she had another. Respondent acknowledged having not visited AH since Christmas Day 2018. There was also a discussion of respondent's access to bus passes to assist with transportation issues. Davis also testified at the hearing and discussed his conversation with AH's father, who had indicated that he could not take custody of AH because he did not have housing and only wanted to visit AH. After respondent testified, however, AH's father informed the court that he wished to seek custody of AH. In March 2019, the trial court held an emergency hearing at which MDHHS asked the court to place AH with his father. Respondent did not object to the placement and indicated that she understood that AH would be placed with his father.

Respondent was not present at an April 2019 hearing. It appeared that respondent believed she did not have to visit with AH or continue services because AH was placed with his father. In April 2019, Kendra Byrd replaced Davis as the caseworker and spoke with respondent around the same time. According to Byrd, respondent asked "how visitation would be set up." Byrd told respondent that she had to work out visitation with AH's father. Byrd testified at another hearing that AH's father told her that respondent had reached out to him about visitation, but they had not agreed on a date. Byrd also testified that respondent's services were terminated because she was noncompliant with services, and that the agency would file a supplemental petition seeking permanent custody because respondent had abandoned AH.

At a hearing in mid-November 2019, Byrd informed the court that respondent had gone to the agency to contact Byrd two weeks earlier and asked about visitation. Respondent also texted Byrd asking about visitation before the November 2019 hearing. Several months later, in mid-July 2020, MDHHS filed a supplemental petition to terminate respondent's parental rights.

In January 2021, the trial court held a hearing at which a new caseworker, Michelle Houstell Jones, testified. Jones testified that she was assigned to the case in mid-October 2020 and that respondent had been visiting AH through Zoom because she was pregnant at the time[1] and had concerns about COVID-19. Jones indicated that respondent was present for all of her visits with AH, but had not participated in services because the last court order was "kind of out of date." According to Jones, respondent acknowledged that the case was still open but did not believe she needed to do anything else because AH was in his father's custody. At the time of the January 2021 hearing, respondent lived with family and was not employed. Jones asked the court to order a new psychological evaluation because respondent was diagnosed with depression and bipolar disorder, but was not addressing her mental health issues.

In November 2021, the trial court held a termination hearing. Jones testified that she contacted respondent in November 2020 to give her information about an upcoming hearing. Jones indicated that she found respondent's number "in the system," a process that took her "[j]ust a few minutes," and called and spoke with her. Contrary to her testimony at the January 2021 hearing, Jones also testified that when she spoke with respondent in November 2020, respondent believed her case was closed because AH was placed with his father. Jones also testified that respondent completed a parenting class in 2018 and a 12-week parenting class in July 2021. She testified that respondent had several jobs throughout this case, including as a dancer, self-employed hair stylist, White Castle employee, and certified nurse assistant in a nursing home. Further, Jones testified that from November 2020 to July 2021, respondent missed only five of her weekly Zoom visits with AH. Those that she missed were because of work. In July 2021, respondent began in-person visits. Though she missed two of the four visits, it was because she had transportation issues. There was also testimony that respondent attended one of AH's dental appointments. In late October 2021, a new foster-care worker, Shakita Wilkerson, observed respondent's residence at the time, a hotel room, and found it not suitable for AH.

Respondent also testified at the termination hearing. She stated that after her Christmas Day 2018 visit with AH, AH's father told respondent that the visits were cutoff. When respondent contacted Davis to find out why, he told her he was no longer assigned to her case. Respondent traveled to an MDHHS office and asked about the new worker assigned to her case, Byrd. No one respondent spoke with knew Byrd's contact information. Respondent also tried contacting AH's father and the father's family. When she reached AH's father, he would set a date for a visit, but never follow through. Respondent also indicated, at one point, that she only arranged visitation through the girlfriend of AH's father because AH's father tried to grope her when she attended AH's dental appointment. Respondent also indicated that the last time she had mental health treatment was when Davis was her foster-care worker. She further testified that although she had money for housing, every place she applied had a waiting list. At the time of the termination hearing, respondent had been living in a motel since July 2021. And she indicated that she was working at Amazon at the time of the termination hearing and had provided Wilkerson a photograph of her paystub.

---

[1] Respondent gave birth to a baby girl, NH, in February 2021. NH is not at issue in this appeal.

After closing arguments, the trial court found that clear and convincing evidence supported statutory grounds for termination under MCL 712A.2b(a)(*i*), (a)(*ii*), (c)(*i*), (c)(*ii*), (g), (j), and (k)(*i*). The court was most concerned with what it described as respondent's abandonment of AH for two years. It also agreed with MDHHS that respondent had become complacent because AH was in his father's care. Further, the court found that it was in AH's best interests to terminate respondent's parental rights. This appeal followed.

## II. STANDARDS OF REVIEW

To terminate parental rights, the trial court must find that at least one statutory ground under MCL 712A.19b(3) has been established by clear and convincing evidence. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding whether a statutory ground for termination has been proven by clear and convincing evidence. MCR 3.977(K). This Court also reviews for clear error the trial court's factual finding that MDHHS made reasonable efforts to reunify a respondent with their child. *In re Atchley*, ___ Mich App ___; ___; ___ NW2d ___ (2022) (Docket Nos 358502, 358503); slip op at 3. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination is in the best interests of the child must be proved by a preponderance of the evidence. *In re Moss*, 301 Mich App at 90. This Court reviews for clear error the trial court's determination regarding a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

## III. LAW AND ANALYSIS

## A. STATUTORY GROUNDS

Respondent first argues that the trial court erred by finding that several statutory grounds for termination were established by clear and convincing evidence. She argues that some of the statutory grounds were inapplicable, and that others were not supported by the evidence. We agree and address each statutory ground in turn.

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(a)(*i*), (a)(*ii*), (c)(*i*), (c)(*ii*), (g), (j), and (k)(*i*). Those statutory grounds permit termination of parental rights under the following circumstances:

> (a) The child has been deserted under either of the following circumstances:
>
> (*i*) The child's parent is unidentifiable, has deserted the child for 28 or more days, and has not sought custody of the child during that period. For the purposes of this section, a parent is unidentifiable if the parent's identity cannot be ascertained after reasonable efforts have been made to locate and identify the parent.

(*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

(k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

(*i*) Abandonment of a young child.

1. MCL 712A.19B(3)(A)(*I*) AND (C)(*II*)

As an initial matter, we agree with respondent's argument—with which MDHHS agrees—that the trial court erred by terminating respondent's parental rights under MCL 712A.19b(3)(a)(*i*) and (c)(*ii*). MCL 712A.19b(3)(a)(*i*) requires, in part, that the parent be unidentifiable. There was no evidence that respondent was ever unidentifiable. The trial court, therefore, clearly erred in terminating respondent's parental rights under MCL 712A.19b(3)(a)(*i*). MCL 712A.19b(3)(c)(*ii*) requires a respondent be notified of other conditions that exist and must be rectified. Respondent

was never notified of other conditions that she had to rectify. The trial court, therefore, clearly erred in terminating respondent's parental rights under MCL 712A.19b(3)(c)(*ii*).

## 2. MCL 712A.19B(3)(A)(*II*) AND (K)(*I*)

Respondent argues that the trial court clearly erred in terminating her parental rights under MCL 712A.19b(3)(a)(*ii*) because she did not desert AH, and she sought custody throughout the proceedings. Similarly, she argues that termination was improper under MCL 712A.19b(3)(k)(*i*) because she did not abandon AH. We agree.

To support termination under MCL 712A.19b(3)(a)(*ii*), MDHHS was required to prove by clear and convincing evidence that respondent deserted her child for 91 or more days and did not seek custody of AH during that period. To support termination under MCL 712A.19b(3)(k)(*i*), MDHHS had to show by clear and convincing evidence that respondent abused AH by abandonment and there is a reasonable likelihood that he would be harmed if returned to respondent's care. "[D]esertion is an intentional or willful act." *In re B & J*, 279 Mich App 13, 18 n 3; 756 NW2d 234 (2008). " '[A]bandon' is defined, in part, as 'to leave completely and finally; forsake utterly; desert: *to abandon a child; to abandon a sinking ship*.' " *Moore v Prestige Painting*, 277 Mich App 437, 449; 745 NW2d 816 (2007) (citation omitted; emphasis in original).

The trial court found that from December 25, 2018, to November 8, 2020, respondent "disappeared" and her location was unknown. The trial court also found that, during that period, respondent did not participate in services and had no contact with MDHHS. Before November 2020, respondent last visited AH on December 25, 2018. She was, however, present at hearings on February 4, 2019, and March 4, 2019. At the March 2019 hearing, the trial court authorized AH's placement with his father. At a hearing on April 15, 2019, MDHHS indicated that respondent had spoken with Jeremy Davis, the caseworker at the time. On July 12, 2019, Kendra Byrd, the newly assigned caseworker, testified that she spoke to respondent in April 2019, and respondent asked how to set up visitation with AH's father. Although AH was still a court ward and the trial court had ordered services and visitation to continue, Byrd told respondent to contact AH's father directly to work out visitation. Respondent contacted Byrd again on September 18, 2019, and again a week later. And at a hearing on November 13, 2019, Byrd testified that respondent had come to the agency two weeks earlier to ask Byrd about visitation. Respondent also texted Byrd on the morning of the November 2019 hearing. Byrd spoke to AH's father, who confirmed that respondent had contacted him about visitation, but they could not agree on a date. There is also no evidence that Byrd offered respondent any services throughout this period or completed a home assessment of respondent's residence to determine whether it was safe for visitation with AH.

Michelle Houstell Jones, another caseworker, was assigned to the case on October 20, 2020. Jones explained that she looked up respondent's number on her computer and called respondent on November 9, 2020, and immediately set up visits between respondent and AH. Thereafter, respondent missed only five of her weekly Zoom visits from November 2020 to July 2021, each because of work. Respondent also completed a 12-week parenting class. Respondent testified that, before then, she had contacted AH's father for visitation with AH, but AH's father never followed through with the actual visits. Respondent also testified that she video chatted with AH when AH was visiting an uncle.

The evidence presented did not clearly and convincingly establish that respondent abandoned AH or deserted him for 91 or more days without seeking custody. On the contrary, the evidence indicated that, despite significant obstacles, respondent made good faith efforts to maintain her connection with AH when the process for doing so was clear. Respondent regularly visited with AH and had progressed to unsupervised, weekend visits, and the plan up until February 2019 was reunification. In March 2019, AH was placed with AH's father, and a new caseworker, Byrd, was assigned to the case around this same time. Respondent continued to attend hearings in February and March 2019, and Byrd confirmed that respondent inquired in April 2019 how to set up visitation after AH was placed with his father. Byrd told respondent that it was her responsibility to coordinate with AH's father for visitation. Thereafter, however, the focus apparently became helping AH's father gain full custody, and Byrd never testified regarding any efforts to assist respondent. Byrd told respondent to coordinate with AH's father regarding visitation and respondent attempted to do so, but was unsuccessful. Once Jones was assigned to the case and she contacted respondent, visits between respondent and AH immediately resumed and respondent completed another set of parenting classes. Even if respondent could have made more of an effort to pursue visitation and custody throughout the case, she attended court hearings, stayed in contact with caseworkers, and attempted to set up visits with AH's father but was not successful. Respondent's conduct demonstrates that there was not clear and convincing evidence that she abandoned AH or deserted him for 91 or more days without seeking custody. Accordingly, the trial court clearly erred by finding that the evidence supported termination under MCL 712A.19b(3)(a)(*ii*) and (k)(*i*).[2]

## B. REASONABLE EFFORTS TOWARD REUNIFICATION

Respondent also argues that grounds for termination were not established under MCL 712A.19b(3)(c)(*i*), (g), or (j). She reasons that MDHHS failed to make reasonable efforts to reunify her with AH after AH was placed with his father, and the focus of the case changed to helping AH's father gain full custody. We agree.

MDHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). "While [MDHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). "The adequacy of [MDHHS's] efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood,* 483 Mich 73, 89; 763 NW2d 587 (2009). The reasonableness of MDHHS's efforts toward reunification is a case-by-case inquiry; it should be tailored to the particular parent and his or her unique attributes, including reasonable modifications to services based on disabilities or challenges. See *In re Hicks/Brown*, 500 Mich 79, 85-90; 893 NW2d 637 (2017).

---

[2] We do not give any particular weight to MDHHS's argument under these two factors that although the regional bus pass allowed respondent to travel without limitation, she refused to take the bus, particularly in light of respondent's diagnosis of schizophrenia and bipolar disorder.

## 1. MCL 712A.19B(3)(C)(*I*)

Regarding MCL 712A.19b(3)(c)(*i*), more than 182 days had passed since the issuance of the initial dispositional order and there was evidence that the conditions that led to the adjudication, lack of safe and suitable housing, continued to exist at the time of the termination hearing. This statutory ground is established when the conditions that brought the child into care continue to exist despite a respondent being given "time to make changes and the opportunity to take advantage of a variety of services. . . ." *In re White*, 303 Mich App 701, 710, 846 NW2d 61 (2014). Termination of parental rights is proper under MCL 712A.19b(3)(c)(*i*) when "the totality of the evidence amply supports that [the respondent] ha[s] not accomplished any meaningful change in the conditions" that led to the adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

AH was brought into care in December 2017 because respondent was unable to care for him in light of her lack stable housing or a legal source of income. At that time, respondent, then age 18, was not participating in any mental health services or treatment despite her previous diagnosis of bipolar disorder and depression. At the time of the termination hearing in November 2021, respondent had been living in a motel since July 2021, which Wilkerson visited and found to be unsuitable. The motel was respondent's third residence in 2021. Respondent was not participating in mental health treatment and never followed through with a medication review as recommended in the psychiatric evaluation.

Respondent argues that MDHHS did not establish by clear and convincing evidence "that there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age" because MDHHS failed to make reasonable efforts at reunification. Respondent argues that MDHHS did not adequately explain to her what AH's placement with his father meant for her case and did not continue to provide her with services at that time. We agree.

At the initial dispositional hearing on January 31, 2018, Davis introduced the initial service plan. At that time, respondent did not object to the plan or any of the services being offered. MDHHS offered respondent parenting classes, home-based individual services for counseling sessions, psychological and psychiatric evaluations, and a referral for an appointment for medication review. MDHHS also provided respondent with regular bus passes and a regional bus pass. Davis provided transportation for respondent to visit with AH until respondent was granted overnight visitation on the weekends. Respondent received services for young parents. After a slow start, respondent participated in services and was progressing toward reunification. Although respondent never participated in a medication review as recommended, there was no indication that she had problems participating in services, that she did not understand what was expected of her, or that the services were not addressing her needs.

But after AH was placed with his father in March 2019, and the trial court ordered that all services and visitation remain in place, MDHHS stopped making any effort toward reunifying respondent with AH. Davis wrote in an April 11, 2019 report that respondent had not visited AH since March 4, 2019. Davis noted, however, that respondent "didn't know that she was able to visit [AH] since [AH] was placed with his legal father . . . ." At the April 15, 2019 hearing, MDHHS informed the trial court that respondent believed she was no longer required to continue with services because AH had been placed with his father. There is no evidence in the record that

-8-

any worker or other person involved in the case explained to respondent that she was still a respondent in an open case and was still obligated to participate in services.

During this change in circumstances and amid respondent's confusion, Byrd was assigned to the case. The record reveals that Byrd did not make any calls to respondent, offer any services to respondent, or facilitate visitation between respondent and AH. Respondent contacted Byrd several times by phone and visited Byrd at her office to inquire about visitation with AH. Byrd wrote in her report that she gave respondent the contact information for AH's father and told respondent to contact him to arrange visitation. Respondent testified at the termination hearing that she tried to arrange visitation with AH's father, but he would never follow through with the visits. There is no indication that Byrd ever attempted to facilitate visitation, or otherwise offered respondent any services. Through July 2019, respondent was still allowed unsupervised visitation, yet there is no evidence Byrd ever attempted a home assessment of respondent's residence to determine whether it was suitable for visitation.

Jones testified that, in October 2020, shortly after she was assigned to the case, she contacted respondent. Within a week, respondent began participating in weekly Zoom visits with AH and completed a 12-week parenting class. Jones also wanted to offer respondent another psychological evaluation because her previous one was outdated.

MDHHS was aware of respondent's cognitive issues, and Davis offered respondent home-based services, counseling, and a parent partner to assist her. Respondent was participating in services and progressing toward reunification when AH was placed with his father and when the former caseworker, Davis, was reassigned to another case. Once Byrd was assigned to this case, the reunification efforts ceased and Byrd left it to respondent to arrange for visitation with AH's father.

The trial court was not persuaded by respondent's claim that she thought the case was closed and that she no longer had to participate in services. The trial court agreed with MDHHS that respondent became complacent because AH was being cared for by his father and respondent was free to do as she pleased. The court did not believe that respondent worked as hard as she could have to determine the status of her case. The trial court did not, however, address MDHHS's lack of efforts during this time. As the trial court noted, respondent was still obligated to participate in services. But Byrd made no effort to offer any of those services to respondent or to facilitate visitation.

MDHHS's lack of reunification efforts after AH was placed with his father affects the likelihood that respondent can rectify the conditions that led to the adjudication within a reasonable time. This is especially so considering that once Byrd was taken off the case and replaced with Jones, respondent began regular visitation and completed a parenting class. Accordingly, the trial court clearly erred by determining that there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering AH's age.

### 2. MCL 712A.19B(3)(G)

The trial court also clearly erred by determining that, under MCL 712A.19b(3)(g), there was no reasonable expectation that respondent, although financially able to do so, would be able

to provide proper care and custody within a reasonable time considering AH's age. As discussed, AH was placed into care because respondent was unable to provide proper care and custody due to her lack of housing and income, and these issues continued to exist in some form at the time of the termination hearing. MDHHS, however, failed to make reasonable efforts toward reunification. This failure contributed to the continued existence of these conditions, especially considering that once a new caseworker was appointed (Jones), respondent immediately resumed visitation and again began participating in services. At the termination hearing, respondent testified that she was working and provided verification of her employment with and income from Amazon. She also testified that she had been looking for housing for months, noting that although she had the money, she could not find anything appropriate for rent. Davis previously testified that MDHHS could help respondent with housing if she could prove she had a legal source of income. But MDHHS failed to offer respondent any services or make reasonable efforts from April 2019 to November 2020. Therefore, the trial court also clearly erred by determining that there was no reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time considering AH's age.

### 3. MCL 712A.19B(3)(J)

Similarly, the trial court also clearly erred by determining that, under MCL 712A.19b(3)(j) there was a reasonable likelihood that AH would be harmed if AH was returned to respondent's home. At the time of the termination hearing, respondent was living in a motel that was not suitable for children. Respondent testified that although she had sufficient funds, she was unable to secure housing due to waitlists for available rental units. Respondent's unstable housing was a problem throughout the case, but had MDHHS made reasonable efforts, it could have assisted respondent in finding housing because she was employed and had money (and an income) to rent a new residence. Therefore, the trial court clearly erred by determining that the evidence also supported termination under MCL712A.19b(3)(j).

### IV. CONCLUSION

For the foregoing reasons, we hold that the trial court erred by finding that the evidence supported statutory grounds for termination. Accordingly, we reverse and remand for further proceedings.[3] We do not retain jurisdiction.

/s/ Anica Letica
/s/ Deborah A. Servitto
/s/ Noah P. Hood

---

[3] In light of our decision on the statutory grounds, it is not necessary to address respondent's additional arguments that termination of her parental rights was not in AH's best interests, or that termination of her parental rights was improper because it was not the "least restrictive means" of ensuring AH's welfare. After review of the best-interest issue, however, we are persuaded that the trial court erred in finding that termination of respondent's parental rights was in AH's best interests. We base this conclusion on much of the same reasoning supporting our analysis of the statutory grounds.

-10-